

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**ENTERED
09/02/2008**

| | | |
|---|---|---|
| IN RE: | § | |
| MARVIN E. MOYE; dba JMW AUTO | § | CASE NO: 07-37770 |
| SALES, LTD; dba JMW AUTO SALES, LLC; | § | |
| dba JMW GROUP INVESTMENTS, LTD.; | § | |
| dba JMW AUTO TRANSPORT, LLC; dba | § | |
| JMW AUTO SALES; dba JMW RETAIL | § | |
| AUTO SALES, LTD., JMW AUTO SALES, | § | |
| JOAN M. MOYE; dba JMW AUTO SALES, | § | |
| LTD. | § | |
| | § | |
| JMW AUTO SALES | § | CASE NO: 07-37364 |
| | § | |
| | § | Jointly Administered Order |
| Debtor(s) | § | |
| | § | CHAPTER 7 |

## MEMORANDUM OF LAW
## CONCERNING TITLE AND LIENS ON VEHICLES IN TEXAS

Debtor was a used car dealer. Hardy Rawls Enterprises ("HRE") advanced money to pay for the purchase of motor vehicles for Debtor's inventory. HRE contends that because it supplied the money to enable acquisition of the vehicles, and because it held physical possession of the vehicle titles, it holds a first lien on the vehicles. HRE did not file a financing statement, cause its lien to be listed on the certificate of title, or give the requisite legal notice of its financing to other lenders. Automotive Finance Corporation ("AFC") also lent money to Debtor, but filed a UCC-1 financing agreement that covered vehicle inventory. The chapter 7 Trustee concedes that AFC has a first lien on these vehicles and has agreed to the Court granting relief from the automatic stay to allow AFC to exercise its rights under state law. The Trustee proposes to deliver the vehicle titles to AFC to permit AFC to realize on its collateral, but HRE objects, asserting that its possession of the vehicle titles both creates and perfects a superior security interest. For reasons set forth below, the Court concludes that HRE does not have a perfected security interest and directs the chapter 7 Trustee to deliver the vehicle titles to AFC.

### I.   APPLICABLE LAW

A.   Evidence of Ownership Before Issuance of a Vehicle Title—Manufacturer's Certificate

A "new motor vehicle" is a motor vehicle that has never been subject of a "first sale," either within Texas or elsewhere. Certificate of Title Act[1] § 501.002(15). If a new motor vehicle has never been registered in Texas or elsewhere, it <u>may be transferred any number of times by a proper endorsement of the manufacturer's certificate,</u> as long as the vehicle remains in the hands

---
[1] Codified at V.T.C.A., Tex. Transp. Code Ann. § 501 *et seq.* (Westlaw 2008).

of a distributor or dealer. *Apeco Corp. v. Bishop Mobile Homes, Inc.*, 506 S.W.2d 711, 14 U.C.C. Rep. Serv. 680 (Tex. Civ. App. Corpus Christi 1974), writ refused n.r.e., (June 12, 1974); *State Highway Dept. v. Texas Automotive Dealers Ass'n*, 239 S.W.2d 662 (Tex. Civ. App. San Antonio 1951), writ refused n.r.e.; *Motor Inv. Co. v. Knox City*, 141 Tex. 530, 174 S.W.2d 482 (1943). So long as the vehicle is a new, unregistered vehicle, there may be repeated transfers of the vehicle, for example from the manufacturer to dealer, from dealer to dealer, and from dealer to owner, without the need to register the vehicle or apply for a certificate of title. All such sales are "first sales." Under these circumstances, a manufacturer's certificate is the only document that evidences title. *Id.*

But all vehicles in dispute in this contested matter were previously titled; they are used vehicles purchased at auction. Certificates of title have been issued for all of the vehicles. *See* Exhibit Q. Therefore, the manufacturer's certificate is irrelevant to deciding pending matters before the Court.

B.   Certificate of Title Act ("Title Act")[2]

One purpose of the Certificate of Title Act is to reduce the potential for sale of an encumbered motor vehicle to a retail purchaser without disclosure to the purchaser of security interests that encumber the vehicle. Title Act § 501.003(3). It establishes a procedure to make sales and transfers. 8 Tex. Jur. 3d Automobiles § 194 (2008).

Title is issued by the Department of Transportation upon the "first sale" of a vehicle to an "owner." Title Act § 501.021(a).

> A "first sale" means: the bargain, sale, transfer, or delivery of a motor vehicle that has not been previously registered or licensed, with intent to pass an interest in the motor vehicle, other than a lien, regardless of where the bargain, sale, transfer, or delivery occurred; and the registration or licensing of that vehicle.

Title Act § 501.002(5).

> "Owner" includes a person, other than a manufacturer, importer, distributor, or dealer, claiming title to or having a right to operate under a lien a motor vehicle that has been subject to a first sale.

Title Act § 501.002(16).

1.   Title and Ownership

The Title Act does not prohibit the registration of a motor vehicle in the name of one who is not the true owner of the motor vehicle. Indeed, the registration of a vehicle in the name of a certain person merely raises a presumption that the person is the owner of the vehicle. This presumption is rebutted when positive evidence to the contrary is introduced. 8 Tex. Jur. 3d

---

[2] Codified at V.T.C.A., Tex. Transp. Code Ann. § 501 *et seq.* (Westlaw 2008).

Automobiles § 209.  Additionally, a contract to sell a vehicle is not illegal, as between the parties to the agreement, merely because the seller may retain the certificate of title to the vehicle.  *Id.*, at § 223.

But HRE does not claim title to the vehicles, and therefore the title aspects of the Title Act are not implicated in this contested matter.

    2.    Title Act as a Way to Perfect Motor Vehicle Liens

The term "lien" (with respect to a motor vehicle) includes a security interest, as defined by Section 1.201, Business & Commerce Code created by any written security agreement, as defined by Section 9.102, Business & Commerce Code, including a lease, conditional sales contract, deed of trust, chattel mortgage, trust receipt, or reservation of title.  Title Act § 501.002(9)(B).

The Title Act provides one method of perfecting a lien in a vehicle.

> (a) Except as provided by Subsection (b), a person may perfect a security interest in a motor vehicle that is the subject of a first or subsequent sale only by recording the security interest on the certificate of title as provided by this chapter.
>
> (b) A person may perfect a security interest in a motor vehicle held as inventory by a person in the business of selling motor vehicles only by complying with Chapter 9, Business & Commerce Code.

Title Act § 501.111.  HRE has no recorded interest on any of the certificates of title.  Exhibit Q.  Therefore, HRE has not satisfied the Title Act for perfection of its lien.

    3.    Possession of Certificate of Title

The Title Act does not recognize possession of the title as a method of perfecting a lien in a titled vehicle.[3]

C.    Texas Business & Commerce Code ("UCC")[4]

Chapters 1-9 of the UCC control over a conflicting provision of the Title Act.  Title Act § 501.005.

    1.    Security Interest in Vehicle Inventory

---

[3] The Title Act states that the term "lien" includes "retention of title" and some of the cases (discussed below) suggest that if an owner agrees to sell a vehicle and retains title pending purchase of the payment price, then retention of the title might perfect the security interest.  Whether or not that is correct, it is not applicable in this contested matter because HRE never owned the vehicles at lissue.

[4] Security interests are covered in Article 9 of the UCC, codified at V. T. C. A., Tex. Bus. & C. § 9.101 *et seq*. (Westlaw 2008).

A secured party is required to file a financing statement and otherwise to comply with Article Nine of the UCC to perfect a security interest in motor vehicles if the motor vehicles are inventory. UCC § 9.302. Motor vehicles constitute inventory if they are held by a person for sale or lease or to be furnished under contracts of service. UCC § 9.109(4). When Article Nine of the UCC governs, mere possession of certificates of title or manufacturer's certificates for motor vehicles held by an inventory financer does not perfect the security interest of the financer in the debtor's inventory of motor vehicles. *Apeco Corp. v. Bishop Mobile Homes, Inc.*, 506 S.W.2d 711 (Tex.Civ.App.1974). *See also*, *Lundy v. First Nat'l Bank (In re Dota)*, 288 B.R. 448, 460 (S.D. Tex. 2003).

      2.      Purchase-money security interest

Purchase-money security interests are governed by Article 9. "Purchase-money collateral" means goods that secure a purchase-money obligation incurred with respect to that collateral. UCC § 9.103(a)(2). A security interest in goods is a purchase-money security interest ("PMSI") to the extent that the goods are purchase-money collateral with respect to that security interest. *Id.* § 9.103(b).

A PMSI in goods other than inventory has priority over a conflicting security interest in the same goods if the PMSI is perfected within 20 days after the dealer takes possession. *Id.* § 9.324(a). A PMSI in inventory has priority over a conflicting security interest in the same inventory if: (1) the purchase-money security interest is perfected within 20 days after the debtor receives possession of the inventory; (2) the purchase-money secured party sends an authenticated notification to the holder of the conflicting security interest; (3) the holder of the conflicting security interest receives any required notification within five years before the debtor receives possession of the inventory; and (4) the notification states that the person sending the notification has or expects to acquire a purchase-money security interest in inventory of the debtor and describes the inventory. *Id.* § 9.324(b).

HRE has not alleged nor offered any evidence that it complied with any of the preceding requirements.

D.      Jurisprudence

HRE cites *BankOne Texas N.A. v. Arcadia Financial, Ltd.*, 219 F.3d 494 (5th Cir. 2000); *Southwestern Investment Co. v. American National Bank of Amarillo*, 374 S.W.2d 318 (Civ.App.-Amarillo 1964, writ ref'd. n.r.e.); *Drake Insurance Co. v. King*, 606 S.W.2d 812 (Tex. 1980); *Arcadia Financial, Ltd. v. Southwest-Tex Leasing Co., Inc.*, 78 S.W.3d 619 (Tex.App.-Austin 2002, pet. denied); *Associates Investment Co. v. Galloway*, 403 S.W.2d 542 (Civ.App.-Amarillo 1966, no writ); *Boswell v. Connell*, 556 S.W.2d 624 (Tex.App.-Beaumont 1977, writ ref'd n.r.e.); and, *Guinn v. Lokey*, 249 S.W.2d 185 (Tex. 1952). These cases do not support HRE's contentions.

*Bank One* was decided on Bank One's having filed a UCC-1 form that put Arcadia on notice. 219 F.3d, at 497. That decision did not rest on possession of title certificates. *Southwestern* relies on the Uniform Trust Receipts Act which was repealed by Acts 1965, 59th Leg., vol. 2, p.1, ch. 721 § 10-102, eff. June 30, 1966, and is now replaced by the UCC. *Drake*

*Insurance* was decided on the lender's having complied with the Title Act, and that decision is contrary to HRE's position. *Arcadia Financial* is distinguishable on its facts and law. Advantage, the party most comparable to HRE, was actually supplying the vehicles (not just financing the purchases), bringing the issue under Article 2 of the UCC. Under the sales agreement between Advantage and the dealer the sales were not complete until Advantage was paid in full. *Associates Investment* holds that the priority of liens must rest upon the title documents under terms of the Certificate of Title Act." 403 S.W.2d, at 544. *Boswell* deals with transfer of ownership not the recording of liens. *Guinn* involves transfer of ownership under the Title Act.

## II.   CONCLUSION

Because the "deal" between Debtor and HRE was essentially a handshake agreement, was not documented, and was vaguely structured according to how the parties thought things would work rather than by compliance with the niceties of statutory and legal requirements, it is difficult to articulate the business "deal" precisely. However, as best the Court can understand, it worked something like this.

HRE would advance funds either directly to Debtor or to vehicle auction houses to facilitate Debtor's acquisition of used auto inventory for resale to the public. Although both Debtor and HRE kept track of which vehicles were purchased with HRE money, HRE never obtained a document that evidenced intent to establish a lien and HRE never recorded evidence (or notice) of a lien by any of the methods set out in Article 9 of the UCC or in the Title Act. Physical possession of vehicle titles was delivered to HRE. Physical possession of the vehicles remained with Debtor, on Debtor's business premises, and Debtor "sold" the vehicles to "owners." Debtor kept the down payment, and eventually "sold" the right to future interest under the retail installment agreement. None of this was documented by written contracts between the parties. The only tangible evidence of the agreement is copies of checks and copies of spreadsheets that Debtor and HRE prepared that are consistent with this analysis. The "sale" of the right to future interest under a retail installment agreement, for example, was simply an oral agreement that future interest, collected by Debtor, would be paid to HRE.

If the vehicle purchasers defaulted, Debtor would repossess the vehicle, take it back into inventory, and then resell the vehicle. Presumably appropriate adjustments would be made to the spreadsheets and various streams of payments relating to the retail sale agreements.

None of the details of these agreements was properly documented and no notice of the agreement was given to anyone except Debtor and HRE. Mr. Rawls testified that his transactions were more on the basis of intuition than business analysis. He said that he doesn't understand the terms involved in the transactions. He uses the word "sale" and "lien" almost interchangeably. He stated that his business was based on trust. He believes that when he advanced funds to Debtor to enable Debtor to acquire a vehicle, he should have the primary claim to the value of that vehicle, regardless of any other claims against Debtor. He did not seek legal advice in structuring the transactions.

An agreement that is based on trust and is not documented is fine as long as there is plenty of money and as long as there are no problems. The purpose of legal agreements is to

define, in advance, who has superior rights when there are not enough assets to go around.  Mr. Rawls made up his own rules rather than learning and following the rules established by the law. He did not follow the rules required to obtain a superior lien, and therefore does not have one.

    SIGNED 08/29/2008.

                                                   Wesley W. Steen
                                                   United States Bankruptcy Judge