**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**ENTERED**
**05/29/2013**

| | | |
|---|---|---|
| **IN RE:** | § | **Case No. 07-37770** |
| **JMW AUTO SALES,** | § | **Chapter 7** |
| | § | |
| **JMW AUTO SALES** | § | **CASE NO: 07-37364** |
| | § | |
| | § | **CASE NO: 08-03062** |
| | § | **Jointly Administered Order** |
| **Debtor(s).** | § | **Judge Isgur** |

<u>**MEMORANDUM OPINION**</u>

The Court must determine whether Lowell Cage must be removed as the chapter 7 Trustee in this case. Because the Court has determined that Cage has faithfully honored his duties as Trustee, he will not be removed.

Mr. Cage has recovered approximately $1.5 million dollars in his capacity as Trustee for the Estate. With Court approval, the Trustee retained his own law firm, Cage, Hill & Niehaus, L.L.P. ("Cage Hill") as counsel. In its Third Interim Fee Application, Cage Hill requested total fees in the amount of $748,856.65. Despite this substantial recovery, the distributions to creditors will be minimal because of the high litigation costs incurred by the Estate. Nevertheless, a substantial award of additional legal fees is justified.

**Events Giving Rise to Show Cause Order**

At the hearing on the Third Interim Fee Application, the Court learned that Sonny Adams, an employee of the Estate, received a vehicle from the Estate's largest creditor (Automotive Finance Corporation, hereinafter "AFC"), and did not provide consideration for the vehicle. Certain former investors alleged that this "gift" of the vehicle led to decisions by Mr. Cage that were unreasonably favorable to AFC.

At the hearing, it was readily apparent that Mr. Cage and many of the claimholders strongly dislike one another.[1]

If Cage Hill's application had been approved as originally filed, substantially all of the Estate's funds would have been paid either to Mr. Cage, his lawyers, or AFC.

These facts raised concerns as to whether Mr. Cage remained in a position to objectively serve in his capacity as trustee of the Estate. Mr. Cage indicated his view that it was in the best interests of the Estate for him to remain as Trustee. The Court issued a show cause order to determine whether Mr. Cage should remain as trustee.

### The Role of a Chapter 7 Trustee

Section 324(a) of the Bankruptcy Code makes the trustee the representative of the bankruptcy estate. *In re Bechuck*, 472 B.R. 371, 375 (Bankr. S.D. Tex. 2012). Indeed, a trustee is vested with extraordinary rights as the general representative of an estate's creditors. *Ingalls v. Erlewine (In re Erlewine)*, 349 F.3d 205, 210 (5th Cir. 2003) (citing, *Coleman v. Alcock*, 272 F.2d 618, 621-22 (5th Cir. 1960). In that capacity, the Chapter 7 trustee serves as a fiduciary to the estate. *Love v. Tyson Foods, Inc.*, 677 F.3d 258 (5th Cir. 2012).

The duties of a trustee are of great import to preserving the integrity and efficiency of the bankruptcy system. Accusations or appearances of impropriety by a trustee should not be taken lightly. Courts should investigate serious accusations against trustees to uphold public confidence in the integrity of the bankruptcy system.

---

[1] The Court's Show Cause Order provides an excerpt from Mr. Cage's testimony at the initial hearing on the application to approve fees. ECF No. 654 at 2-4. Mr. Cage's answers to questions were consistently nonresponsive, combative or filled with extraneous information. Although it is apparent that the parties dislike one another, that alone is not a basis for removing Mr. Cage. Moreover, the evidence shows that Cage has properly administered the Estate notwithstanding the personal animosity.

Based on this precept, the Court issued its Order to Show Cause.   ECF No. 654. Hearings were held over a three month period.   A total of 25.5 hours of Court time were consumed.   47 exhibits were offered into evidence.   Five witnesses testified in the Trustee's case-in-chief.   Five witnesses testified in the Respondent's case-in-chief.   Following these extensive hearings, the Court is firmly convinced that Mr. Cage has fully satisfied his fiduciary obligations and should not be removed as the chapter 7 trustee.

### Background

On October 31, 2007 an involuntary chapter 7 petition was filed on behalf of JMW Auto Sales, L.L.C ("JMW").   Case No. 07-37364.   The principals of JMW, Marvin and Joan Moye filed a voluntary chapter 7 petition on November 6, 2007.   Case No. 07-37770.

Prior to the bankruptcy filings, JMW was in the retail used car business and provided in-house financing on its vehicles.   *Waite, et al. v. Cage (In re Moye)*, 458 Fed. Appx. 385, 387 (5th Cir. 2012).   In order to obtain in-house financing from JMW, purchasers would execute a retail installment sales contract.   *Id*.   JMW generated additional cash-flow by selling pools of installment contracts to outside investors.   *Id*.

The sales of the installment contracts were memorialized by a generic Master Purchase and Sale Agreement ("PSA").   *Id*.   The parties often ignored the terms of the PSA.   *Id*. at 388. For example, JMW would often remit monthly distributions to a pool participant equal to the full amount of principal and interest due, regardless of the amount actually collected by JMW.   *Id*. Consequently, JMW was unable to continue making payments to the pool participants.   To generate needed cash, JMW sold certain of the installment contracts to a third party, Mid-Atlantic Finance Company, ("Mid-Atlantic"), at a discounted price.   *Id*.   A portion of the

proceeds of the sale to Mid-Atlantic were paid to pool participants.  *Id*. at 388-89.  At the time of the petition JMW's  inventory included approximately 100 vehicles.

Subsequent to the Moyes filing their voluntary petition, Lowell Cage was appointed chapter 7 trustee in the voluntary case.  On November 13, 2007, the Court issued an Agreed Order for Relief in an Involuntary Case Requiring Appointment of a Chapter 7 Trustee and Interim Provision for Filing Schedules in the JMW Case.  ECF No. 50 at 1.  Mr. Cage was appointed chapter 7 trustee in the JMW case as well.  ECF No. 50 at 1.  On December 3, 2007, the Court issued an Order for Joint Administration of Case No. 07-37364 and Case No. 07-37770.

On December 20, 2007, the Trustee filed his Application for Retention of Counsel for the Trustee, (ECF No. 50), seeking to employ a law firm in which Cage is a partner, Cage Hill.  On January 1, 2008, the Court issued its Order Authorizing Employment of Counsel.  ECF No. 72.

On April 27, 2012, Cage Hill filed its Third Interim Application for Compensation by Attorney for Trustee, Cage, Hill & Niehaus, L.L.P. for Period July 29, 2010 through March 31, 2012 (the "Application").  ECF No. 627.  Cage Hill sought fees in the amount of $320,806.00 resulting in total fees requested in the Application and all prior applications of $748,856.65.[2] ECF No. 627 at 1.

On May 18, 2012, several creditors filed their Response Opposing the Third Interim Application for Compensation by Attorney for Trustee.[3]  ECF No. 629.

---

[2] On December 12, 2012, Cage Hill filed its Amended Third Interim Application for Compensation by Attorney for Trustee, Cage, Hill & Niehaus, L.L.P. for Period July 29, 2010 through March 31, 2012, (ECF No. 657), voluntarily reducing its fees from $320,806.00 to $200,000.00, agreeing to waive the $62,000.00 in fees that accrued through December 1, 2012, and advising the Court that Mr. Cage was voluntarily reducing his chapter 7 trustee fee by approximately $60,000.00.

[3] The creditors were jointly represented by attorney Ronald Hinds and will be referred to as the Hinds' Clients.

**The 2001 Lexus**

A hearing was held on the Application on October 5, 2012.  At the October 5 hearing, Sonny Adams (a former employee of JMW and the Trustee) testified that he received a 2001 Lexus L430 automobile (the "Lexus") from the Moyes as an employment perk.  Mr. Adams testified that title to the Lexus was signed over to him by Mrs. Joan Moye.  On May 30, 2008, Judge Steen (then the presiding judge over this bankruptcy case) issued an Order declaring the post bankruptcy transfer of the Lexus to Adams a void transaction.  Judge Steen also denied the Trustee's motion to authorize a *nunc pro tunc* transfer of the Lexus.[4]  ECF No. 148.  Mr. Adams testified that within a few days following Judge Steen's order, he returned the Lexus and its title to the Trustee's office.  The Lexus was returned to AFC.  Mr. Adams then sought to acquire the Lexus from AFC.

The Lexus was run through an auction to determine its value.  AFC placed the car in the auction, but purchasers were advised that the Lexus might or might not actually be sold.  The highest bid at the auction was for $5,700.00.  ACF then offered to sell the Lexus to Mr. Adams for $5,800.00.  In July 2008, Mr. Adams received the Lexus and the title from AFC in exchange for a cashier's check in the amount of $5,800.00.

Mr. Adams' cashier's check for the Lexus was never cashed by AFC.  He alleges that he received a written notification from his credit union informing him that the check was never cashed.  When he contacted AFC about the notification, Adams was informed that everything

---

[4] At the May 30, 2008 hearing, Judge Steen did not make a determination regarding how Mr. Adams initially came into possession of the Lexus.  This fact remains disputed, but is not relevant here.

was in order. [5]  Mr. Adams testified that until the October 5, 2012 hearing, the Trustee was not aware that the check was never cashed.

Mr. Cage and his counsel expressed surprise that the check was never cashed.  The Court ordered a continuance of the hearing to allow the parties to depose an agent of AFC, or otherwise learn from AFC why Mr. Adams' check was never cashed.

The hearing was continued to November 27, 2012.  At the November 27 hearing, Alan Padfield appeared on behalf of AFC.  He was unable to provide any additional information about the Lexus or why Mr. Adams' check was not cashed.

To compound the problem, Mr. Adams was responsible for preparing certain documents that were ultimately filed with the Court.  One of those documents—prepared by Mr. Adams but signed by Mr. Cage—inaccurately stated that the Lexus was sold at auction and also stated an inaccurate date for the sale.

The Court expressed its concern as to whether Mr. Cage remained in a position to objectively serve in his capacity as Trustee of the estate.  The Court stated that:

> The case has devolved to the point that having spent virtually all of the collection of the funds on paying for attorneys, the Court now has a concern that under Mr. Cage's watch, one of his employees received a car without paying for and caused Mr. Cage to file documents that turned out to be inaccurate.  The issues concern how much the trustee fee should be; whether the legal fees were earned; and whether transactions with AFC need to be given additional review.

The Court gave the Trustee and his counsel the opportunity to discuss whether Mr. Cage should remain in his position as Trustee.  Mr. Cage expressed that as a fiduciary of the Estate, the Estate would be best served if he remained.[6]

---

[5] The Court does not believe that Mr. Adams made a bona fide attempt to clarify the matter.  He was aware of the highly unusual nature of the transaction.  Rather than calling anyone at AFC who was in a position of authority, Adams apparently called AFC's main telephone number and was connected to an unidentified clerk.

On November 28, 2012, the Court issued its Order to Show Cause on whether Mr. Cage should be removed.  ECF No. 654.

### Condition of Estates on Petition Dates

Mr. Michael Durrschmidt served as the Moyes' attorney prior to the appointment of Mr. Cage as the Trustee.  Mr. Durrschmidt testified at the show cause hearing regarding the state of affairs Mr. Cage inherited upon his appointment.  There were ninety-six used cars, 112 contracts, no ability to reorganize and no equity, and 700 pages of schedules and statements.  The majority of the Debtors' customers were low-income, many did not speak English.  Many of the car notes were payable weekly and were paid in cash or by cashier's check.  Because of this unique circumstance, it was necessary to maintain a deposit box for customers to deliver their payments.  Due to the complexity of the business, the Trustee chose to retain two JMW employees, Sonny Adams and Sandra Martinez.  Mr. Durrschmidt recommended these employees to Mr. Cage.  He recommended Mr. Adams because he had an understanding of the notes and the pools.  He recommended Ms. Martinez because she was interfacing with customers.

Mr. Cage also testified that upon his appointment, he found the estate in a mess.  This was the most difficult case he has ever administered.  There were many contracts for payment and he was unsure which of the pool participants owned the contracts.  Some of the pool participants were collecting on their contracts and others were relying on JMW to collect on the contracts.  Many cars that had been sold out of trust were being driven without tags.  Various people claimed to have liens on vehicles sold at or around the time of the involuntary petition.  It took Mr. Cage significant time to determine the extent of the mess.  Most of the pool contracts he

---

[6] The Court commends Mr. Cage for this decision.  It would have been much easier for Mr. Cage to step down, but in considering the best interests of the estate, he did not take the easy way out.

found were not executed, and therefore he believed title had not passed.  Counsel for one pool participant, MRB Management, L.L.C. ("MRB") convinced Mr. Cage that title had, in fact passed by common law and contract.  After meeting with Select Group (another pool participant), he determined that under Texas law, unlicensed persons could not hold a contract, so began working on those pool participants that held a license.  By his first operating report, Cage had over 200 hours in attorney time and 200 hours in trustee time invested in the Estate.

### Preferences

After conducting a UCC search, Mr. Cage determined which of the pool participants he believed had liens on the vehicles—he determined that AFC and Dealer Services Corporation ("DSC") held perfected liens.  It appeared that AFC and DSC had a lien on the inventory they had floor-planned.  AFC and DSC had already seized their collateral prepetition, so the Trustee agreed to lifting the stay.  After notice and hearing, an order was issued that lifted the stay and AFC and DSC foreclosed on their respective collateral.

Mr. Hardy Rawls/Hardy Rawls' Enterprises LLC ("Hardy Rawls") also claimed to have provided outside financing to JMW for at least some of the collateral repossessed by AFC and DSC prepetition.  Trustee's Exhibit 4 is a letter from Hardy Rawls' attorney, Patrick Hoskins.[7] After receiving the letter from Mr. Hoskins, Mr. Cage believed that Hardy Rawls was not a secured creditor and concluded that Mr. Cage would be able to get titles to the vehicles Mr. Rawls held.  Based on the letter from Mr. Hoskins, he did not believe he would have any fight with Hardy Rawls, and believes a significant amount of money would have been saved had this belief been accurate.

---

[7] Exhibit 4 was admitted for the limited purpose of showing that Mr. Cage received the letter, and his reaction to the letter.

Warren Waite, Jr./Kings Kar LLC, Warren Waite, III, and Robert and Shirley Strange were also pool participants claiming an interest in the repossessed vehicles.[8]

Mr. Cage, through counsel, sent letters to all pool participants requesting face-to-face meetings. He did not immediately begin litigating, because he believed that attempting to peaceably resolve the participants claims would keep costs down. When no agreement could be reached, and with encouragement from the Court to move the case more rapidly, Mr. Cage decided to sue MRB and Warren Waite, Jr./ Kings Kar LLC (the largest two pool participants). *See* Trustee's Exhibit 8. Mr. Cage chose his strategy because he believed that if he succeeded in these suits, he could get a declaratory judgment that none of the pool participants owned the contracts, and he could bring preference actions against them.

The Trustee also filed his Application to Sell Property of the Estate Free and Clear of Liens, Claims and Encumbrances, seeking authority to sell 130 vehicles.[9] ECF No. 177. AFC and Hardy Rawls both objected to the Trustee's Application to Sell.[10] ECF Nos. 185 & 186. At the July 14, 2008 status conference, Hinds suggested that a global mediation would be helpful, and requested that AFC participate in the mediation as well. AFC agreed to participate so long as Hardy Rawls was involved.

Judge Steen ordered a global mediation by all interested parties.[11] ECF No. 203. Judge Steen additionally ordered Mr. Cage to file all adversary proceedings related to preference

---

[8] These pool participants, along with Hardy Rawls, are the "Hinds' Clients."

[9] This figure increased from the ninety-six vehicles at the start of the case because the Estate subsequently repossessed a number of vehicles.

[10] By this time, Ronald Hinds had substituted in as counsel for Mr. Hardy Rawls and Hardy Rawls Enterprises LLC, Warren Waite Jr. and Warren Waite III, and Mr. and Mrs. Robert and Shirley Strange.

[11] With the belief that the mediation would be largely successful, the Trustee chose not to retain contingency counsel in order to keep administrative expenses down.

actions in advance of the global mediation. Mr. Cage filed eight additional adversary proceedings in compliance with Judge Steen's order.

Mr. Rawls, Mrs. Strange and Mr. Waite III, did not appear at the mediation in Dallas. At the mediation, Mr. Warren Waite Jr. and Mr. Robert Strange alleged that they served as representatives of the absent defendants.[12] Mr. Waite Jr. testified at the show cause hearing on March 4, 2013. He testified that he learned that the Hinds' Clients were the only parties with whom Mr. Cage did not reach a settlement at the mediation. He suggested that Mr. Cage did not make a good faith effort to negotiate a settlement with the Hinds' Clients. According to Mr. Waite, Mr. Cage had agreed with favorable settlements with several pool participants. However, as to the Hinds' Clients, Mr. Cage demanded a minimum of a 75% recovery of alleged preferences.

When cross-examined, Mr. Waite admitted that he made no counter offer at the mediation or otherwise. He asserted that no counter offer was made because the mediator told him that doing so would be futile. Mr. Waite's complaint is misplaced. A bankruptcy trustee can and should make reasoned negotiating decisions. In certain instances, a trustee may be prepared to make uniform settlements. In other instances, a trustee may decide that non-uniform settlements will result in a greater recovery. Some of the obviously valid reasons for this differential are:

- Some defendants, like the Hinds Clients compared to certain other pool participants, may have a greater ability to pay a preference judgment.

- Some defendants, like the Hinds Clients when compared to AFC, may have weaker defenses.

---

[12] The Trustee sought sanctions against the Hinds' Clients not in attendance at the mediation for violating Judge Steen's order to attend the mediation. Sanctions were granted.

- Some defendants, like the Hinds Clients when compared to certain others at the mediation, may seem more reluctant to settle and a trustee may decide to bluster his way to a better settlement for the Estate.

- Some defendants, like the Hinds Clients when compared to certain other pool participants, may have a greater exposure. The greater exposure ordinarily makes the legal expenses of litigation proportionately smaller. For example, a trustee may be willing to settle a $10,000.00 for only $5,000.00 to avoid litigation expense. A $100,000.00 claim would not receive such a 50% discount solely to avoid litigation expense.

Contrary to the arguments made by the Hinds' Clients, Mr. Cage has demonstrated that he has devoted the time, and judgment, to best administer this case. He has recognized each defendant's individual factors, and based on his own business judgment, Mr. Cage attempted to negotiate the best outcome for the Estate. As shown below, the Hinds' Clients vigorously defended their positions. Ultimately, their vigorous defense forced Mr. Cage to spend more in legal fees; but Mr. Cage's belief that he could collect from most of the Hinds' Clients also proved true.

On September 29, 2008, Judge Steen issued a Memorandum of Law Concerning Title and Liens on Vehicles in Texas. ECF No. 212. Judge Steen found that AFC had filed a UCC-1 financing agreement giving it a perfected first lien on the Debtors' inventory. Based on this finding, relief from the automatic stay was granted to allow AFC to exercise its state law rights with respect to the inventory. ECF No. 212 at 1.

Judge Steen concluded that Hardy Rawls did not have a perfected security interest in any of the Debtors' vehicles and directed Mr. Cage to deliver the vehicle titles to AFC. ECF No. 212 at 1. Judge Steen found that it was the law of the case that Hardy Rawls' interest was unperfected and found that the Hardy Rawls' claim was unsecured.

By the time that Mr. Cage filed his fourth operating report on December 3, 2008, he had incurred 98.6 trustee hours during the period from August 15, 2008 through December 3, 2008, totaling approximately 440 hours. During the same period, Mr. Cage reported 247 hours of attorney time, for a total of approximately 757 hours. Mr. Cage believes that the amount of time spent on the case was unusually large and was due in large part to an attempt to resolve the competing ownership interests in the loans and collect on the loans. Mr. Cage does not believe that anything could have been done differently to reduce the hours incurred as of his December 3, 2008 report. There is no evidence challenging the accuracy of those beliefs.

By the time Mr. Cage filed his fourth operating report, he had resolved all of the adversary proceedings except those against the Hinds' Clients. Mr. Cage eventually obtained summary judgment against all of the Hinds' Clients. These judgments were appealed to the district court, and subsequently to the Fifth Circuit. The judgments were affirmed by both appellate courts.

**Vehicle Auctions**

AFC sold its collateral at auction and credited its claims against the Estate with the net auction proceeds.[13] The Hinds' Clients contend that Mr. Cage attempted to conceal the invoices for JMW inventory sold at auction because the vehicles were sold below their value. On cross examination Mr. Hinds asked Mr. Cage how he maximized the value of the vehicles sold at auction. Mr. Cage testified that the Court lifted the stay to allow AFC to liquidate the vehicles pursuant to its blanket lien on JMW's entire inventory. The liquidation occurred over a period of approximately four months, with roughly twenty cars being auctioned at a time. Originally Mr.

---

[13] Because of a settlement with AFC, the actual amount of the credits was probably not material to the Estate. As set forth below, however, the actual credits were appropriate.

Cage had entered into an agreement with an auction house to sell the vehicles himself, but when AFC objected he withdrew this proposal because his accountants advised him that for tax purposes it was better for AFC to conduct the sale.

In Mr. Cage's Motion for Authority to Sell, (ECF No.130), he stated his opinion that the auction would net conservatively, $250,000.00 for the remaining vehicles. The average price per vehicle sold at AFC's auction was $1,400.00.[14] AFC agreed to account to the Estate for any amount over $200,000.00 received at the auction. AFC also had to pay MRB a portion of the auction proceeds. MRB claimed a lien on the forty-two vehicles auctioned by AFC, and AFC agreed to pay MRB a portion of the proceeds pursuant to a compromise reached with MRB. After payment to MRB, the net proceeds from the auction were approximately $156,000.00. Mr. Cage stated that he had no reason to believe that AFC would not attempt to maximize its return.

In July 2009[15] the Trustee sold thirteen more vehicles at auction for a net value of approximately $21,000.00, or an average of $1,500.00 per vehicle. *See* ECF No 345. On April 7, 2011, the Trustee sold six additional vehicles for a net value of $14,000.00, or an average of $1,750.00 per vehicle. *See* ECF No. 561. The Trustee conducted a final sale of seventeen vehicles on March 1, 2012 for a net value of $12,250.00 or an average of slightly less than $1,000.00 per vehicle. *See* ECF No. 624.

According to Respondents' Exhibit B, which provides auction invoices for all of the vehicles sold, some vehicles were auctioned for amounts as low as $50.00. Darlene Phillips, a

---

[14]  Although the $1,400 sounds like a low amount, the used cars sold by JMW appear extraordinary. JMW specialized in rehabilitating "salvage vehicles" and reselling them at retail. The "salvage vehicles" had ordinarily been declared a total loss by an insurer. The titles issued by the State of Texas indicated that the vehicles were salvage vehicles. Some, but not most, of the vehicles had been stripped of their engines, seats, and other components and were little more than bent frames. Under these circumstances, the auction prices no longer seem so extraordinary.

[15] According to the Trustee's Report of Sale at ECF No. 345, the auction took place on June 28, 2009.

JMW employee, and Mr. Strange, both testified that in their extensive experience in the used car auction industry, there was no explanation for such low sale prices.

The evidence introduced by the Hinds Clients showed that the auction amounts for many vehicles were far below the actual cash value, ("ACV"), listed on the auction papers for the vehicles.  Ms. Phillips and Mr. Strange both testified that the ACV listed on the auction papers was a reasonable estimate for the expected value at auction.  Accordingly, the Court selected the three vehicles with the greatest disparity.  As to those vehicles, the Court ordered that the entire auction file be produced.  The auction file on these three vehicles was produced.  It included extensive photographs of the vehicles.

As established by subsequent testimony, Ms. Phillips and Mr. Strange were incorrect in their testimony.  The ACV in the auction papers represented the value that would be expected to be received from a vehicle in average condition given the age and make of the vehicle.

Trustee's Exhibits 36, 39, 42, and 45 provide photographic evidence of the condition of the cars auctioned for the exceptionally low amounts.  It is apparent from the photographs that the values were reasonable based on the stripped condition of the vehicles.

The Court concludes:

- Mr. Cage could not control the conduct of the auctions after the stay had been lifted. Control of the auctions was properly with AFC.

- The auctions were conducted by AFC on an arms-length basis.

- Mr. Cage had no bona fide basis to challenge the credits received by the Estate as a result of the auctions.

### Legal Fees

The Hinds' Clients challenge whether Mr. Cage properly controlled the legal fees incurred by the Estate.  The Hinds Clients argue that hiring counsel on a contingency fee would

have been more beneficial to the Estate since Cage Hill's fixed fee has resulted in the Mr. Cage's firm receiving approximately ninety percent of the recovery to the Estate.

Mr. Cage denied that his firm is receiving ninety percent of the recovery. The total recovery to the Estate is approximately $1.5 million. Administrative expenses include, among other things, bond fees, sales taxes, licensing fees, deposition transcript costs, DMV taxes, monthly expenses related to the Debtors' computer systems and record storage, mediator fees, estate employees and professionals. He estimated that there was a total of $300,000.00 in operating expenses, $150,000.00 paid to AFC, and approximately $80,000.00 paid to other professionals.

As an initial matter, the retention of Cage Hill on an hourly fee basis was approved by the Court. The Court cannot now alter the terms of the retention, unless events have occurred that could not have been anticipated at the time of the retention. 11 U.S.C. § 328.

Mr. Cage performed a comparison of the hourly fee (actually charged by his firm) and what would have been charged had he retained counsel on a contingency. Regardless of whether certain work was performed on a contingent basis, there was still hourly work to be done. The testimony is uncontroverted that $260,000.00 in legal fees were incurred for work that could not have been performed on a contingent fee basis. With respect to work that could have been performed on a contingent fee basis, the following chart shows the hypothetical contingent fees:

| Hypothetical Contingent Rate | Total Contingent Fee |
| --- | --- |
| 30% | $407,000.00 |
| 40% | $543,000.00 |

When the $260,000.00 in base legal fees is added to these hypothetical contingency fees numbers, the total fees for the Trustee's counsel would have been between $667,000.00 and $803,000.00. The actual total fees incurred by the Trustee's counsel at the time of hearing were $748,856.65—essentially in the middle of the two hypothetical contingency figures.

Based on the Court's experience and the nature of these claims, the Court finds it unlikely that contingent fee counsel would have accepted an assignment in these cases at the 30% level.

Additionally, at the Trustee's request, Cage Hill voluntarily reduced the fees in its Third Interim Application from $320,806.00 to $200,000.00 and has agreed to waive payment of the fees accrued through December 1, 2012, totaling approximately $62,000.00. These reductions result in total fees of $628,050.65. This total is less than the hypothetical legal fees if the Trustee had obtained a 30% contingency fee arrangement.[16]

## Jurisdiction

The District Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(a). Pursuant to 28 U.S.C. § 157(a), this proceeding has been referred to the Bankruptcy Court by General Order 2012-6. This is a core matter under 28 U.S.C. § 157(b)(2)(A).

## Standard of Proof

The Bankruptcy Code is silent on the standard of proof required to remove a trustee. *In re Tres-Ark, Inc.*, 483 B.R. 460, 467 (Bankr. W.D. Tex. 2012). At least one court has held that due to the seriousness of removing a trustee, the standard should be clear and convincing evidence. *In re Walker*, 2004 WL 3152787, at *1 (S.D. Fla. Dec. 1, 2004).[17] However, when the

---

[16] The Court also notes that the Trustee has agreed to reduce his statutory fee from approximately $70,000.00 to $10,000.00.

[17] The trustee was removed in *In re Walker* after the court found by clear and convincing evidence that the trustee had committed fraud upon the court by falsely asserting she had no connection with any of the debtor's creditors and

Code is silent on the burden of proof, the Supreme Court states preponderance of the evidence is presumed unless particularly important individual interests or rights are at stake.  *Grogan v. Garner*, 498 U.S. 279, 286 (1991).  *Grogan's* evidentiary presumption is limited to "civil actions between private litigants."  *Id.*  In contrast, this matter involves fundamental issues pertaining to the administration of hundreds of bankruptcy cases.  The Court must assure both the integrity of chapter 7 trustees, and their ability to operate independently.

Removal of a trustee is an extreme remedy.  *See United States Trustee v. Repp (In re Sheehan)*, 185 B.R. 819, 822 (Bankr. D. Ariz. 1995); *see also Ritchie Special Credit Investments, Ltd., et al. v. U.S. Trustee, et al.*, 415 B.R. 391, 399 (D. Minn. 2009).  The seriousness of removal is emphasized by the fact that some courts will only remove a trustee upon a showing of fraud or actual injury to the estate.  *See In re Bennett*, 2007 WL 2480524, at *9 (Bankr. N.D.N.Y. Aug. 28, 2007) (citing *Freeport Italian Bakery, Inc.*, 340 F.2d 50, 54 (2d Cir. 1965)); *see also In re Lundborg*, 110 B.R. 106. 108 (Bankr. D. Conn. 1990).

The Code provides that whenever a trustee is removed from a case under § 324, the trustee will automatically be removed from all cases in which he is serving, unless the court specifically orders differently.  If the trustee engaged in a breach of his fiduciary duty, it is only appropriate that the default provision of § 324 (that is, removal from all cases) should be invoked.  If the trustee is removed for a lesser cause, the Court might invoke authority to remove the trustee from a single case.

In this case, the concern is one of a breach of fiduciary duty.  If the Trustee should be removed, then he should be removed from all cases under § 324(b).  Cage is currently a trustee in

---

producing falsified documents to conceal her relationship with one of the debtor's creditors.  The trustee also committed perjury by consistently lying under oath about her relationship with one of the debtor's creditors.  2004 WL 3152787, at *15.

329 open cases and adversary proceedings.  His removal would be disruptive as it would result in a change of trustee in all 329 cases and adversary proceedings.  Under these circumstances, there are particularly important interests at stake that mandate the use of a "clear and convincing" standard of proof.

The majority of the case law concerning the removal of a trustee involves negligence or intentional misconduct by the trustee.  *Baker v. Seeber (In re Baker)*, 38 B.R. 705, 707 (D. Md. 1983).  However in some instances a trustee is removed based solely on a consideration of what is in the best interests of the bankruptcy estate.  *Id*. at 708.  In *In re Mason*, the trustee was relieved of her duties because the court believed that the trustee would never have the assistance and cooperation of the debtor due to bitter feelings by the debtor towards the trustee.[18]  12 B.R. 318, 318-19 (Bankr. D. Nev. 1981).  In such instances, where the court finds a conflict, but there is no evidence that the trustee abused the conflict, and a trustee will only be removed from one case, the standard for removal might only be a preponderance of the evidence.

In contrast, when a trustee is removed from all cases in which he is serving, removal would indicate negligence or intentional misconduct by the trustee.  A trustee's negligent or intentional misconduct jeopardizes an important public interest, the integrity of the bankruptcy system.  As such, when removal from all cases is at stake, the standard of proof should be clear and convincing evidence.  Because this proceeding contemplates negligence or intentional misconduct by the Trustee, the standard of review is clear and convincing evidence.

Clear and convincing evidence is "that weight of proof which produces in the mind of the trier of fact a firm belief on conviction as to the truth of the allegations sought to be established,

---

[18]The trustee's husband was the deputy district attorney who successfully prosecuted the debtor in a criminal proceeding.  *In re Mason*, 12 B.R. at 318.

evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case." *Shafer v. Army & Air Force Exch. Serv.*, 376 F.3d. 386, 396 (5th Cir. 2004).

In *In re CNC Payroll, Inc.*, this Court, issued an order to show cause following a letter the trustee wrote soliciting other firms to serve as estate counsel.  2013 WL 1844109, at *1 (Bankr. S.D. Tex. May 1, 2013).  The show cause order was issued because the letter appeared to be designed to favor the trustee's firm—a breach of the trustee's fiduciary duty.  *Id*.  The Court found that the letter was intended to dissuade other firms from competing with the trustee's own firm, to the detriment of the estate.  *Id*. at 8.  However the Court was especially persuaded by the declaration of an attorney at one of the firms that received the solicitation letter, which provided that once his firm expressed interest in the case, the trustee treated him fairly in all respects.  *Id*. The Court held that there was not clear and convincing evidence that the trustee breached his fiduciary duty.  *Id*.

In *In re IFS Financial Corporation, et al.*, this Court issued an order to show cause when it was discovered that the trustee and his attorney (also his wife), billed the estate $3,486.37 in travel expenses for a five day trip to New Orleans for Fifth Circuit oral arguments.[19]  2013 WL 2018540, at *1 (Bankr. S.D. Tex. May 13, 2013).  The Court found that during the pendency of the case, the trustee had consistently acted to advance his law firm's interest to the detriment of the estate.  His prior conduct was evidence that the billing was not simply an error in judgment, but an intentional act in derogation of his fiduciary responsibilities.  *Id*. at *6, 8.  The Court

---

[19] The couples' six-year-old twins accompanied them on the trip.

found that the trustee's breach of his fiduciary duty was clear and unmistakable, and ordered his removal.[20]  *Id*. at *9.

## Analysis

**A.    Removal for Cause**

11 U.S.C. 324 provides that:

> "(a) The court, after notice and a hearing, may remove a trustee, other than the United States trustee, or an examiner, for cause.  (b) Whenever the court removes a trustee or examiner under subsection (a) in a case under this title, such trustee or examiner shall thereby be removed in all other cases under this title in which such trustee or examiner is then serving unless the court orders otherwise."

What constitutes cause for dismissal is not defined in the Code, but is to be determined on a case-by-case basis.  *Dye v. Brown, et al. (In re AFI Holding, Inc.)*, 530 F.3d 832, 845 (9th Cir. 2008); *see also Miller v. Miller (In re Miller)*, 302 B.R. 705, 709 (B.A.P. 10th Cir. 2003). "It is well established that cause may include trustee incompetence, violation of the trustee's fiduciary duties, misconduct or failure to perform the trustee's duties, or lack of disinterestedness or holding an interest adverse to the estate."  *In re AFI Holdings*, 530 F.3d at 845.

As set forth above, the Court recently removed a chapter 7 trustee when he acted in derogation of his fiduciary duties and for the benefit of his own law firm.  *In re IFS Financial Corporation, et al,* 2013 WL 2018540, at *1 (Bankr. S.D. Tex. May 13, 2013).

In *Morgan v. Goldman*, the chapter 13 trustee negotiated a deal with debtors to use insurance settlement proceeds to pay a secured creditor ahead of unsecured creditors while not reflecting such a deal in the debtors' plan.  *In re Morgan*, 573 F.3d 615, 618-619 (8th Cir. 2009). The trustee later changed her testimony and denied she made such a deal.  *Id.* at 621-22.  The

---

[20] As a result, the trustee was removed from all cases in which he was serving.

bankruptcy court issued a show cause order, requiring the trustee to show cause why she should not be removed. *Id.* at 622. The Eighth Circuit upheld the trustee's removal because the trustee gave false testimony regarding her agreement with the debtors. *Id.* at 627-28. The trustee was removed from all cases in which she was serving as trustee. *Id.* at 622.

In *In re AFI Holdings*, the chapter 11 trustee failed to disclose that she had previously represented one of the debtor's former investors in a dispute between the investor and the debtor. *In re AFI Holdings*, 530 F.3d at 841. The trustee brought numerous preference actions and failed to bring a preference action against the former client. *Id.* at 842. The trustee did not disclose the extent of her relationship with the former client until after deposition testimony revealed the connection. *Id.* The removal of the trustee for lack of disinterestedness was upheld by the Ninth Circuit Bankruptcy Appellate Panel and the Ninth Circuit.[21] *Id.* at 852.

In *In re Vega*, the chapter 7 trustee solicited $50,000.00 from a lender, ostensibly to fund a lawsuit related to the bankruptcy. 102 B.R. 552, 554 (Bankr. N.D. Tex. 1989). Instead, the trustee invested the funds in certificates of deposit, which he used to secure a personal loan obligation. *Id.* at 553. A portion of the funds were delivered to the trustee's law firm and consumed in the course of the firm's general operations. *Id.* The court found that the unauthorized acquisition and use of the funds was a breach of the trustee's fiduciary duty under § 324, and cause for dismissal from all cases in which he was serving as trustee. *Id.* at 554.

In *In re Stephens & Co.*, the court held that although it could not conclude that the trustee was dishonest, his neglect and indifference were grounds for removal, when considering the best

---

[21] Neither the Ninth Circuit's Order or the BAP Opinion provide whether the Trustee was removed from all cases in which she was serving as Trustee.

interests of the estate and the need to properly interpret and enforce the bankruptcy laws.[22]  30 F.2d 725 (S.D. Cal. 1928).  The Court found that the trustee employed negligent methods of accounting for expenses of administration, received irregular and unauthorized commissions, and purchased property of the bankruptcy estate.  *Id.* at 725-26.  The court held that such acts were detrimental to the estate and could not be approved.  *Id.* at 727.

**B.    Cause in this Case**

Cause does not exist to remove Mr. Cage in this case.  To the contrary, the Court finds that Mr. Cage has well and faithfully executed his duties as Trustee.  When Mr. Cage became Trustee he was faced with a very difficult task.  Due to the state of the Debtors' affairs upon appointment, Mr. Cage was required to expend an unusual amount of time in administering this Estate.  Mr. Cage incurred approximately 440 trustee hours in the first nine months of the case. He acknowledges that this amount is unusually high, but the Court finds that the time expended was reasonable in light of the complex nature of the case.

Mr. Cage made diligent, good faith efforts to resolve the disputes with potential preference defendants without protracted litigation.  He successfully settled with all other preference defendants (except for the Hinds' Clients) during mediation.  He subsequently obtained summary judgment against the Hinds' Clients in the preference actions.

Judge Steen previously made findings that several of the Hinds' Clients were vexatious litigants.  As the Court has previously found, it is apparent that the parties in this case dislike one another.  Of course, the Hinds' Clients were well within their rights to appeal any judgments entered against them, and vigorously defend their positions.  While the Court makes no judgment

---

[22] Although *In re Stephens* predates the Bankruptcy Code, the Court finds its holding persuasive and applicable to current bankruptcy law.

regarding their actions, it is a fact that these actions did create additional costs for the Estate and prolonged the case for a significant period of time.  These actions were beyond Mr. Cage's control, and as the fiduciary of the Estate he was charged with defending against such litigation.

It is true that Mr. Cage became exasperated with the Hinds' Clients.  Although they had every right to vigorously defend themselves, they sometimes crossed the line from vigorous defense to vexatious conduct.  More importantly, their vigorous defenses were untempered by economic and practical realities.  The Court doesn't *blame* the Hinds' Clients for their uneconomic and impractical defenses.  But, the results are now in.  The final appeal is over.  Mr. Cage's legal and factual positions were vindicated on appeal.

In apportioning responsibility for the unreasonably high legal costs, surely the prevailing party should not be blamed for a successful defense.  To criticize Mr. Cage's successful defense would invite litigants to spend unreasonable sums just to force bankruptcy trustees to abandon meritorious claims.  Rather than criticizing Mr. Cage, the Court applauds his conduct.[23]

The transfer of the Lexus is still inexplicable, as no one from AFC has been able to clarify why Mr. Adam's check was never cashed.  However, the Court does not find that this transaction is any reflection on Mr. Cage or his performance in this case.  It is apparent that Mr. Cage did not learn about the events surrounding Mr. Adam's check until the October 5, 2012 hearing.  Any impropriety by Mr. Adams does not implicate the Trustee.[24]

The Court heard extensive testimony as to whether Mr. Adams exercised any influence over Mr. Cage's decisions with respect to either AFC or the Hinds' Clients.  There is a complete

---

[23]  This statement should not be misread.  The Court does not applaud the extreme expenditure of funds.  But, Mr. Cage was left with no choice.  As a trustee, he vigorously pursued the Estate's claims.

[24]  For the limited purpose of this opinion, this Court will assume that the Adams/AFC relationship was inappropriate.

absence of evidence that Mr. Cage's conduct was in any way influenced in these matters by Mr. Adams.  Accordingly, Mr. Cage's conduct in these matters was not impugned by the evidence.

With respect to the vehicle auctions, it is clear that the Trustee acted reasonably. Evidence was provided regarding the state of the vehicles which were allegedly auctioned below their value.  It is apparent from Trustee's Exhibits 36, 39, 42, and 45 that they were completely inoperable, junk vehicles and the low auction prices were commensurate with the condition of the vehicles when sold.

The show cause hearing provided extensive testimony regarding Mr. Cage's performance as Trustee.  The evidence at the hearing demonstrates that the Trustee diligently executed his fiduciary duties to the Estate.  The Court finds no evidence that Mr. Cage breached his fiduciary duty.  He will not be removed.

## C.      Legal Fees

The Fifth Circuit has held that in determining the compensation of professionals employed by the estate the lodestar method, *Johnson* factors and 11 U.S.C. § 330, coalesce to form the framework for arriving at the proper fee amount.  *CRG Partners Group, L.L.C. v. Neary (In re Pilgrims Pride Corp.)*, 690 F.3d 650, 656 (5th Cir. 2012).

### i)      Lodestar Method

The lodestar amount is found by multiplying the number of hours reasonably expended by the prevailing hourly rate in the community for similar work.  *Id*. at 655.  A bankruptcy court has the discretion to adjust the lodestar amount upwards or downwards in light of its analysis of the *Johnson* factors.  *Id*.

ii)   *Johnson* **factors**

The twelve *Johnson* factors that courts must consider in determining reasonableness of fees are:

> "(1) The time and labor required; (2) The novelty and difficulty of the questions; (3) The skill requisite to perform the legal service properly; (4) The preclusion of other employment by the attorney due to acceptance of the case; (5) The customary fee; (6) Whether the fee is fixed or contingent; (7) Time limitations imposed by the client or other circumstances; (8) The amount involved and the results obtained; (9) The experience, reputation, and ability of the attorneys; (10) The "undesirability" of the case; (11) The nature and length of the professional relationship with the client; (12) Awards in similar cases."
>
> *Id*.

iii)   **11 U.S.C. § 330**

Pursuant to 11 U.S.C. § 330(a)(1)(A), the court may award reasonable compensation to a professional person, or attorney for actual, necessary services rendered by the professional person, or attorney.

11 U.S.C. § 330(a)(3) provides that the following factors should be considered in determining the amount of reasonable compensation to a professional person:

A)   The time spent on such services;

B)   The rates charged for such services;

C)   Whether the services were necessary to the administration of, or beneficial at the time they were rendered toward completion of a case under this title;

D)   Whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

E)   Whether the professional person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

F)     Whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

### iv)     Fees in this case

The Court finds that the rates charged by Cage Hill are commensurate with the prevailing hourly rate in the community for similar work.   The rates were disclosed in the Trustee's Application for Retention of Counsel for the Trustee.   ECF No. 50.   Approval by Judge Steen evidences a finding of reasonableness of the rates.

After review of Cage Hill's Billing Report from July 29, 2010 through March 31, 2012 the Court finds that the hours reflected in the Report were reasonably expended.   The total of 1,273.12 hours when multiplied by the variable rates of each professional provides a total of $320,806.00.

Beginning with the base number of $320,806.00, the Court next considers the *Johnson* factors.   The lodestar method is presumed to account for four of the twelve *Johnson* factors— "the novelty and complexity of the issues, the special skill and experience of counsel, the quality of representation, and the results obtained from litigation."   *In re Pilgrims Pride Corp.*, 690 F.3d at 659.   Therefore these factors are not considered when making an upwards or downwards adjustment of the fee.

The time and labor required is reflected in the Cage Hill Billing Report and reflects that a significant amount of time was expended by counsel, but is fully accounted for within the lodestar calculation.   The Court has determined that the rates charged by Cage Hill are a customary rate in the community for similar work.   The fee arrangement with Cage Hill was on a fixed fee basis.   The time limits imposed on Cage Hill relate to Mr. Cage's duty to administer the estate as efficiently and expeditiously as possible.   The Court determines that Mr. Cage and his

counsel made a good faith effort to fulfill this duty.  The Court determines that the fees requested by Cage Hill are comparable to awards in similar cases.  The Court does not consider preclusion of other employment, undesirability of the case, or the nature and length of the professional relationship to be relevant factors in this instance.

Upon examination of the relevant *Johnson* factors, the Court determines that no upwards or downwards adjustment of the lodestar amount is necessary.

The discussion *supra* encompasses a discussion of the non-exhaustive factors provided in 11 U.S.C. § 330(a)(3).  Consideration of the § 330(a)(3) factors requires no upwards or downwards adjustment of the fee.

Cage Hill has voluntarily reduced its fee to $200,000.00.  This amount is approved.  The reimbursable expenses in the amount of $11,211.61 are also approved.

## Conclusion

The Court will enter orders consistent with this Memorandum Opinion.

SIGNED **May 29, 2013.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE